## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INDIGENOUS PEOPLE OF BIAFRA, a
United Kingdom registered Community
Interest Company,'

      *Plaintiff,*                      Civil Action No. 1:21-cv-2068 (ABJ)

      *v.*

ANTHONY BLINKEN, Secretary of State, in
his official capacity, et al.,

      *Defendants.*

_____

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

BACKGROUND ............................................................................................................. 1

ARGUMENT ................................................................................................................. 3

   **A.**   **Associational Standing**................................................................................. 3

   **B.**   **Individual Standing** .................................................................................... 4

   **C.**   **LEAHY LAWS CREATE PRIVATE CAUSES OF ACTION** ....................... 7

   **D.**   **Committed by Law to Agency Discretion**........................................................ 11

   **E.**   **Plaintiff's Claims Do Not Raise A Non-Justiciable Political Question** .......... 12

   **F.**   **The Court Should Not Withhold Declaratory or Injunctive Discretionary Relief**............................................................................................................. 14

CONCLUSION............................................................................................................. 14

CERTIFICATE OF SERVICE ...................................................................................... 15

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baker v. Carr*,
369 U.S. 186 (1962)................................................................................................13

*Barenblat v. United States*,
360 U.S. 109 (1959)................................................................................................11

*Boumediene v. Bush*,
553 U.S. 723 (2008)................................................................................................12

*Elk Run Coal Co. v. U.S. Dept. of Lab*,
804 F. Supp. 2d 8 (D.D.C. 2011)...........................................................................10

*Hamdan v. Rumsfeld*,
548 U.S. 557 (2006)................................................................................................12

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004)................................................................................................12

*Lochner v. New York*,
198 U.S. 45 (1905) (Holmes, J. dissenting).............................................................3

*Luhan v. Defenders of Wildlife*,
504 U.S. 555, 560-561 (1992) .................................................................................4

*Marbury v. Madison*,
5 U.S. 137 (1803)....................................................................................................11

*Raines v. Byrd*,
521 U.S. 811 (1997)..................................................................................................8

*Sanchez-Espinoza v. Reagan*,
770 F. 2d 202 (D.C.Cir. 1985)...............................................................................14

*Simon v. Eastern Kentucky Welfare Rights Organization*,
426 U.S. 26, 41-42 (1976) .......................................................................................4

*Statewide Bonding, Inc. v. U.S. Department of Homeland Security*,
422 F.Supp. 3d 35 (D.D.C. 2019), aff'd, 980 F. 3d 109 (D.C.Cir. 2020)...............10

*Touche Ross & Co. v. Reddington*,
422 U.S. 560 (1979)..................................................................................................7

*Trump v. Hawaii*,
    138 S.Ct. 2392 (2018) ...................................................................................................12

*U.S. House of Representatives v. Azar*,
    2018 WL 8576674 (D.D.C. 2018) ...................................................................................8

*U.S. House of Representatives v. Burwell*,
    130 F. Supp. 3d 53 (D.D.C. 2015) ..................................................................................8

*Warth v. Seldon*,
    422 U.S. 490, 508 (1975) ................................................................................................4

*Zivotofsky v. Clinton*,
    566 U.S. 189 (2012) .......................................................................................................13

**Statutes**

5 U.S.C. 706 (2) (C) ............................................................................................................10

10 U.S.C. 362 ....................................................................................................................8, 9

International Emergency Economic Powers Act ...................................................................6

Trade Expansion Act, or the Global Magnitsky Human Rights Accountability Act
    section 232 ......................................................................................................................6

**Other Authorities**

Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or
    Punishment (CAT) (Article 3) .........................................................................................6

International Convention for the Protection of All Persons from Enforced
    Disappearance (ICPPED) (Article 16) .............................................................................6

Nigeria's Terrorism Prevention Amendments, 2013 ..............................................................2

**BACKGROUND**

The Muslim, Fulani controlled Federal Government of Nigeria (FRG) is engaged in a genocidal campaign to destroy Biafrans in whole or in substantial part because of their ethnicity or Christianity. Complaint, para. 24. Among other things, the FRG is using security forces guilty of gross violations of human rights to perpetrate the genocide.

Defendants do not and could not deny the voluminous credible evidence that Nigeria's security forces are complicit in gross violations of human rights. The State Department's 2020 Report on Human Rights Practices in Nigeria, for example, reported the assault and arrest of a Voice of America Hausa-service reporter for conducting interviews about the extrajudicial killings of members of IPOB and the killings and indiscriminate arrests of civilians during crackdowns against IPOB.

Since Nigeria's birth as a nation in 1960, the Fulani have ruthlessly persecuted Biafrans. They largely reside in Southeast Nigeria. Fulani leader Sir Ahmadu Bello reportedly exhorted on October 12, 1960: "The new nation called Nigeria should be an estate of our great grandfather [jihadist] Othman Dan Fodio. We must ruthlessly prevent a change of power. We must use the minorities in the North as willing tools and the South as conquered territory and never allow them to rule over us and never allow them to have control over their future." https://www.nairaland.com/search?q=Othman+Dan+Fodio+1960+&search=Search.

Plaintiff, Indigenous People of Biafra (IPOB), was born of self-defense to the FRG Fulani fueled genocide. IPOB subscribes to non-violent protest in the manner of Mahatma Gandhi. Its aim is to secure an independent Biafran state through a self-determination referendum fairly and freely organized and conducted by the United Nations. Complaint, para. 4.

Without due process, IPOB has been listed as a terrorist organization by the FRG. No other

1

country in the world has followed suit. The FRG prosecutes IPOB membership or professed membership as terrorism. IPOB leader Nnamdi Kanu has been charged by the FRG with terrorism for proclaiming membership in a London, UK radio broadcast. To proclaim or provide evidence of IPOB membership in Nigeria is to invite death, retribution, or criminal prosecution by the FRG.

Nigeria is a lawless state. Court orders are routinely flouted with impunity. Plaintiff's counsel has direct evidence of the same. Among other things, Plaintiff's counsel has twice been illegally blocked from the Federal High Court of Nigeria by Nigeria's armed security forces in seeking to assist Nigerian lawyers in representing his client Nnamdi Kanu against concocted criminal charges. See Ex. 1-Affidavit of Bruce Fein. For the Department of Justice to expect IPOB to operate with the earmarks of a United States membership organization protected by the rule of law is unreasonable and betrays an ignorance or callous indifference to cruel facts on the ground for Biafrans in Nigeria.

IPOB represents John Does 1-10, IPOB members. They would be targeted for death or prosecution for terrorism by the FRG under section 16 of Nigeria's Terrorism Prevention Amendment of 2013 with a minimum 20-year prison term if their identities. were disclosed. See Ex. 2-Affidavit of Nigerian Solicitor Ifeanyi Ejiofor. The objectives of the John Does align perfectly with IPOB's in opposing the sale and delivery of A-29 Super Tucano aircraft to Nigeria's security forces guilty of gross violations of human rights. John Does 1-10 reasonably fear the Super Tucanos will be sued to kill or injure them in the FRG's ongoing genocidal campaign against Biafrans. Complaint, para. 35.

Defendants' Memorandum in Support of Defendants' Motion to Dismiss subscribes to an extra-constitutional imperial presidency above the law in foreign affairs or national security. The Memorandum profanes the Constitution's separation of powers and checks and balances enshrined

2

to forestall government abuses or misadventures. It reduces Congress and the Leahy Laws to sound and fury signifying nothing. It overflows with generalities heedless of Justice Oliver Wendell Holmes' wisdom that, "General principles do not decide concrete cases." *Lochner v. New York*, 198 U.S. 45, 76 (1905) (Holmes, J. dissenting). The Leahy Laws make only intermittent cameo appearances in Defendants' Memorandum in Support.

Defendants argue that (1) Plaintiff and members John Does 1-10 lack Article III standing; (2) the Complaint fails to state an actionable claim under the Leahy Laws or the Administrative Procedure Act; (3) Defendants' challenged actions in the sale and delivery of the A-29 Super Tucano aircraft to Nigeria are committed to executive discretion by law; (4) Plaintiff's claims raise a non-justiciable political question; and, (5) the Court should desist from discretionary injunctive or declaratory relief to avoid confounding the foreign policy of the executive branch.

These arguments will be answered seriatim.

## ARGUMENT

**A.      Associational Standing**. IPOB possesses associational standing on behalf of members John Does 1-10. They have demonstrated unwavering solidarity with IPOB far beyond ordinary membership organizations. Their IPOB membership affirmations in the Complaint expose them to criminal prosecution in Nigeria with a minimum prison term of 20 years. Section 16 of the Terrorism Prevention Act Amendments, 2013 ("Any person who is a member or professes to be a member of a terrorist group commits an offense and is liable upon conviction to imprisonment for a term of not less than twenty years."); Ex. 2-Affidavit of Nigerian Barrister Ifeanyi Ejiofor. This stark fact permits the reasonable inference that John Does 1-10 are genuine not bogus members of IPOB willing to risk that last full measure of devotion to pursue IPOB's independent sovereignty cause through non-violence.

**B.    Individual Standing.** IPOB members John Does 1-10 possess individual standing sufficient to confer associational standing on IPOB. Individual standing requires allegations of actual or imminent concrete injury; injury fairly traceable to the challenged action of defendants; and, a likelihood that a favorable decision will redress the injury. See *Luhan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41-42 (1976); *Warth v. Seldon*, 422 U.S. 490, 508 (1975).

The John Does allege fear of imminent death or serious bodily injury traceable to the actions of Defendants in selling and delivering A-29 Super Tucano military aircraft to Nigeria's security services guilty of gross violations of human rights, including an ongoing genocide of Biafrans involving bombing deaths of civilians. Complaint, para.5-14, 35. Those fears are not speculative. The Federal Government of Nigeria has conducted periodic air attacks against Biafrans at least since last February. http://saharareporters.com/2021/02/19/second-nigeriabiafra-war-has-just-started-we-will-defend-our-land-%E2%80%94-ipob.

Defendants scoff at the John Does' fears of death on the killing fields of Biafra as "highly attenuated and speculative."  Def. Mem. 18. Maybe it is if you are sitting safely and comfortably in a Department of Justice office on Pennsylvania Avenue, N.W. But the fear is anything but attenuated and speculative for Biafrans in Southeast Nigeria suffering atrocities daily at the hands of Nigeria's Fulani-controlled security services which Defendants do not deny. Complaint, para.24-26. On November 17, 2021, the *New York Times* reported that the Nigerian army shot and killed at least 11 unarmed protestors and wounded dozens of others during a demonstration last year, in an incident a government panel condemned as a "massacre."  "Nigerian Army Engage In 'Massacre' at Protest," (by Ben Ezeamalu, A4).

Defendants blithely urge this Court to throw the dice with the lives of John Does 1-10 by

a crabbed application of the doctrine of standing. But the law of standing does not require such heartlessness. Standing requirements should be relaxed (albeit not abandoned) when human lives are at stake because of flagrant injustice.

Defendants insist that whether the Fulani-controlled security services use the Super Tucanos against the John Does is too speculative and remote to establish an imminent injury. Id. But Nigeria's security services are committing genocide against Biafrans with every weapon at their disposal. Complaint, para.24-26, 33. The Federal Government of Nigeria has announced its intent to employ the Super Tucanos to fight terrorism. www.cfr.org. (Taliban Capture of Super Tucano Highlights Risk in Nigeria). And the FRG has labelled IPOB a terrorist organization with neither evidence nor due process. Contrary to Defendants, there is a high level of certainty that the Super Tucanos will be used to kill Biafrans, including John Does 1-10, sufficient to confer standing to challenge their sale and delivery to Nigeria's security services by Defendants.

The analogous case of Walter Durrfeld, technical manager of IG Farben's Auschwitz plant during World War II, is informative. Evidence established that Durrfeld knew the sale of Zyklon B to the Nazi exterminators would be used in the Holocaust. He was accordingly convicted of complicity in the mass extermination of Jews because of his knowing involvement in the Zyklon B sales to the Third Reich. See I.G. Farben Trial, Military Tribunal VI created by U.S. Military Government for Germany, August 8, 1947, Trial August 14, 1947-July 30, 1948.

A legal obligation of one country to anticipate the wrongdoing of another is no novelty. The principle of non-refoulement prohibits States from transferring or removing individuals from their jurisdictions or effective control when there is a substantial risk of irreparable harm upon return, including persecution, torture, maltreatment, or other serious human rights violations. Under international human rights law the prohibition of refoulement is explicitly included in the

Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) (Article 3), and the International Convention for the Protection of All Persons from Enforced Disappearance (ICPPED) (Article 16).

Defendants dispute a causal nexus between John Does' 1-10 alleged injuries and the sale and delivery by Defendants of A-29 Super Tucano Aircraft to Nigeria's security services guilty of gross violations of human rights. Def. Mem. 19-22. The causal nexus has been explained, supra. Defendants' repeated insistence to the contrary is discredited by the ongoing genocide of Biafrans in Nigeria perpetrated by its Fulani-controlled security services. The law should not be blind to what all the world can see.

Defendants also deny the redressability of Plaintiff's alleged injuries through the relief sought. Def. Mem. 22-24. Defendants speculate that even if this Court granted IPOB declaratory or injunctive relief, Nigeria's security services would nevertheless keep and use the A-29 Super Tucanos to kill Biafrans in its ongoing genocide.

Defendants ignore the vast leverage the United States enjoys over the Federal Republic of Nigeria to obtain the return of the illegally sold and delivered Super Tucanos. Spare parts or training necessary for operation of the aircraft could be denied. And an array of potential economic or travel sanctions under the International Emergency Economic Powers Act, section 232 of the Trade Expansion Act, or the Global Magnitsky Human Rights Accountability Act hang like a sword of Damocles against Nigeria for failing to return illegally transferred Super Tucanos.

Indeed, the United States has already jawboned Nigeria into confining use of the Super Tucanos against Boko Haram terrorists in the North according to PUNCH (October 23,2021, "U.S. asks Nigeria to restrict Super Tucanos to North"). U.S. Principal Deputy National Security Advisor Jonathan Finer is quoted as saying:

6

> "We are pleased to deepen our security cooperation with the Nigerian government. I think we made it very clear our expectations about this platform where it would be used and in the right way and we are always raising concerns when we have them and that it's true with all our security partners around the world.
>
> "This is an important platform for security, particularly in the North and we are pleased the transaction is finally concluded."

The *New York Times* reported on November 21, 2021, regarding the Secretary of State's recent visit to Abuja, Nigeria ("China's Influence Looming Over Blinken's Africa Visit," A8):

> "Mr. [Secretary of State] Blinken also made implicit reference to concerns that American military aid to Nigeria, mainly intended to help the government combat Islamist extremist groups like Boko Harem has been used instead to commit human rights abuses. Mr. Blinken said on Thursday the U.S. was working to ensure 'that the assistance we provide is used in a way that fully respects the human rights of every Nigerian.'"

C.     **LEAHY LAWS CREATE PRIVATE CAUSES OF ACTION.** The touchstone of analysis is congressional intent. See, e.g., *Touche Ross & Co. v. Reddington*, 422 U.S. 560 (1979). The Leahy Laws were enacted because Congress believed the Executive Branch would reflexively shortchange human rights to promote weapons exports absent statutory restraints. Experience taught Congress that the Executive was an untrustworthy steward of human rights in the exportation of arms.

The Leahy Law governing the State Department, Section 620M of the Foreign Assistance Act of 1961, as amended, provides:

> "(a) IN GENERAL.—No assistance shall be furnished under this Act or the Arms Export Control Act to any unit of the security forces of a foreign country if the Secretary of State has credible information that such unit has committed a gross violation of human rights."

The prohibition of subsection (a) is categorical. Its sole beneficiaries are prospective victims of human rights violations perpetrated by the security services of the foreign country

7

involved. The law does not provide for enforcement by an independent government agency. It will be unenforced and become a dead letter without a private cause of action. And the only parties who would have Article III standing to enforce subsection (a) would be persons imminently endangered by a violation, in this case, John Does 1-10.

Defendants do not argue that Congress itself would have standing to seek judicial enforcement of the Leahy Amendments. See *Raines v. Byrd*, 521 U.S. 811 (1997); *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53 (D.D.C. 2015); *U.S. House of Representatives v. Azar,* 2018 WL 8576674 (Order Vacated, Case Closed).

Congress presumably wishes its statutes to be honored, not disrespected. That objective requires implying a private right of action. Subsection (a) bespeaks congressional distrust of the Executive Branch's commitment to human rights in arms sales without outside policing.

Congress recognized a need for a narrow exception in applying subsection (a) to accommodate the multiple considerations that inform enlightened foreign policy. Accordingly, subsection (b) provides:

> "EXCEPTION. The prohibition in subsection (a) shall not apply if the Secretary determines and reports to the Committee of Foreign Relations of the Senate, the Committee on Foreign Affairs in the House of Representatives, and the Committees on Appropriations that the government of such country is taking effective steps to bring the responsible members of the security forces to justice."

The Secretary of State, however, did not invoke subsection (b) in delivering the Super Tucanos to Nigeria's security services guilty of gross violation of human rights, including an ongoing genocide of Biafrans.

The Leahy Law governing the Department of Defense, 10 U.S.C. 362, like its State Department counterpart, intended to create a private cause of action for enforcement to avoid making the prohibition toothless. Subsection (a) (1) provides:

> "Of the amounts made available to the Department of Defense, none may be used for any training, equipment, or other assistance for a unit of a foreign security force if the Secretary of Defense has credible information that the unit has committed a gross violation of human rights."

For the reasons explained regarding implying a private right of action to enforce subsection (a) of Section 620M of the Foreign Assistance Act, a private right of action was clearly intended by Congress to be implied to enforce subsection (a) (1) of 10 U.S.C. 362 to avoid reducing the prohibition to hortatory only.

As with 620M of the Foreign Assistance Act of 1961, section 362 creates a narrow exception to its categorical subsection (a) (1) prohibition in recognition that foreign policy frequently requires a balancing of human rights against countervailing interests. Accordingly, subsection (b) provides:

> EXCEPTION.—
> The prohibition in subsection (a)(1) shall not apply if the Secretary of Defense, after consultation with the Secretary of State, determines that the government of such country has taken all necessary corrective steps, or if the equipment or other assistance is necessary to assist in disaster relief operations or other humanitarian or national security emergencies."

Additionally, Congress authorized a waiver of the subsection (a) (1) in subsection (c) to accommodate extraordinary circumstances:

> "(c)WAIVER.—
> The Secretary of Defense, after consultation with the Secretary of State, may waive the prohibition in subsection (a) (1) if the Secretary determines that the waiver is required by extraordinary circumstances."

Neither subsection (b) nor (c) was invoked by the Secretary of Defense in connection with the sale or delivery of the A-29 Super Tucano aircraft to Nigerian security services guilty of gross violations of human rights, including an ongoing genocide of Biafrans.

Defendants maintain the Complaint fails to allege facts or permit inferences that monies or funds of the State Department or Defense Department were used to execute the sale or delivery of

the Super Tucano aircraft to Nigeria. Def. Mem. 28-29. But it is more than reasonable to infer that the Tucanos did not arrive in Nigeria by spontaneous combustion. The use or assistance of State Department or Defense Department salaried employees and equipment must have been involved. That more than plausible inference is sufficient to trigger the Leahy Laws.

Moreover, the U.S. Air Force has awarded the U.S. Army Corps of Engineers, Europe Division, a $36.1 million contract to construct facilities to support operation of the Super Tucanos. https://defencetimesng.com/research-development-united-states-army-corps-of-engineers-secures-36-1-million-contract/.

Defendants additionally argue that Plaintiff's claims under the Administrative Procedure Act, 5 U.S.C. 706 (2) (C) fail to state a claim. Def. Mem. 30. Defendants insist that as a matter of law, the Leahy Laws were honored, and that the APA claims are too vague to survive a motion to dismiss. But the cases relied upon by Defendants are misplaced.

In *Statewide Bonding, Inc. v. U.S. Department of Homeland Security*, 422 F.Supp. 3d 35, 40 (D.D.C. 2019), aff'd, 980 F. 3d 109 (D.C.Cir. 2020), at issue was an agency's interpretation of its own regulations. Here, in contrast, Defendants have never proffered an explanation for non-application of the Leahy Law subsection (a) prohibitions as applied to the sale and delivery of the Super Tucanos to Nigerian security forces guilty of gross violations of human rights. Among other things, Defendants have not contradicted Plaintiff's allegations that Nigeria's security forces have perpetrated gross human rights violations including an ongoing genocide of Biafrans.

In *Elk Run Coal Co. v. U.S. Dept. of Lab,* 804 F. Supp. 2d 8, 31 (D.D.C. 2011), the complaint failed to allege any discrete, final agency action to review. Here, the Complaint does allege discrete, final agency action, i.e., Defendants' decision to sell and deliver A-29 Super Tucano military aircraft to Nigerian security forces guilty of egregious human rights violations.

10

**D.** **Committed by Law to Agency Discretion.** Defendants errantly argue that IPOB's APA claims challenge conduct that has been committed to agency discretion under the Leahy Laws. Def. Mem. 31-38. The latter prohibitions were enacted because Congress distrusted executive branch discretion in arms sales under the Arms Export Control Act or otherwise which Congress concluded were wont to shortchange human rights. The whole purpose of the Leahy Laws is to *limit* agency discretion. Defendants' contrary argument makes the Leahy Laws' subsection (a) exceptions and waiver provision superfluous because subsumed in unreviewable Executive Branch discretion.

Also unpersuasive is Defendants' argument that congressional oversight of arms sales militates against judicial review. Congress's plenary constitutional power of investigation endows the legislative branch with oversight authority over every statute. See e.g., *Barenblat v. United States,* 360 U.S. 109, 111 (1959) ("The power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate; it has similarly been utilized in determining what to appropriate from the national purse, or whether to appropriate. The scope of the power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution").

In sum, if congressional oversight of the Executive's implementation of a statute ousts judicial review, countless executive branch acts or omissions would evade a judicial check. A government of laws would be replaced by a government of men. *Marbury v. Madison,* 5 U.S. 137, 163 (1803) ("The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right.")

**E.**     **Plaintiff's Claims Do Not Raise A Non-Justiciable Political Question**. Defendants' political question defense argument smacks of a counter-constitutional imperial presidency above the law—a throwback to former President Donald Trump's alarming proclamation on July 23, 2021: "Then I have Article 2, where I have the right to do anything I want as president."  Def. Mem. 38-44.

Contrary to Defendants, the President is not endowed with exclusive constitutional power over foreign policy or national security shielded from judicial review. In *Trump v. Hawaii*, 138 S.Ct. 2392, 2423 (2018), the Supreme Court overruled *Korematsu v. United States,* 323 U.S. 214 (1944), to invalidate a wartime decision by both the President and Congress to establish concentration camps for 120,000 Japanese Americans.

The Supreme Court has repudiated blank check power by the executive and Congress in the post 9/11 war on terrorism. See e.g., *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004); *Hamdan v. Rumsfeld,* 548 U.S. 557 (2006); *Boumediene v. Bush*, 553 U.S. 723 (2008). In sum, the Supreme Court has rejected a categorical claim of a textually demonstrable constitutional commitment of foreign policy or national security decisions to the President.

Further, contrary to Defendants, Plaintiff is not asking the judiciary to second-guess a joint decision of the Executive and Congress to sell and deliver the Super Tucanos to Nigeria. Plaintiff is only asking the judiciary to honor statutes enacted by Congress which the President is obligated to faithfully execute under the Tale Care Clause of Article II, section 3.

Defendants could have invoked statutory exceptions or a waiver from the Leahy Laws' subsection (a) prohibitions in the interest of foreign policy, national security, or otherwise. But they did not—probably to escape political accountability and embarrassment from providing weapons to Nigeria's notorious security forces engaged in genocide against Biafrans. Instead,

Defendants simply ignored the Leahy Laws as congressional impertinences to putative executive supremacy in international affairs.

Again, contrary to Defendants, to decide this case is not to make a judicial policy determination about foreign policy. *To decide is to implement a foreign policy judgment made by Congress which the Executive is bound to honor under Article II, section 3.* Defendants do not argue that the Leahy Laws unconstitutionally infringe on the President's foreign policy or national security prerogatives.

Judicial interpretation and application of subsections (a) of the Leahy Laws in this case would not require the Court to determine whether the sale or delivery of the Super Tucanos to Nigeria would best serve United States foreign policy. The Court would simply be enforcing a foreign policy embraced by Congress which Defendants tacitly concede is constitutional.

Neither would a judicial decision manifest a lack of respect due to the President or Congress under the Constitution. Indeed, to refrain from a decision would disrespect the legislative power of Congress over foreign affairs or national security that found expression in the Leahy Laws.

Further, contrary to Defendants, adjudication of Plaintiff's claims would not carry "the potentiality of embarrassment of multifarious pronouncements by various departments on one question." *Baker v. Carr*, 369 U.S. 186, 217 (1962). A decision would simply enforce a foreign policy prescribed by Congress. As the Supreme Court observed in *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) in a comparable case involving a statute bristling with foreign policy implications: "The federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy toward Jerusalem should be. Instead, Zivotofsky requests that the courts enforce a specific statutory right.

13

To resolve his claim, the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional. This is a familiar judicial exercise."

**F.     The Court Should Not Withhold Declaratory or Injunctive Discretionary Relief.** Defendants urge the Court to dismiss the Complaint as a matter of equitable discretion over declaratory or injunctive relief to avoid throwing a spanner into the President's foreign policy involving Nigeria. Def. Mem. 44-45. Defendants' reliance on *Sanchez-Espinoza v. Reagan*, 770 F. 2d 202 (D.C.Cir. 1985) is unconvincing. There, Congress had not specifically spoken by statute to the issue in dispute, whereas here Congress through the Leahy Laws has spoken directly to the foreign policy in question. Moreover, there the requested relief would have impacted four foreign states, whereas here only Nigeria would be affected. Further, the Executive retains discretion under the Leahy Laws to consummate the Super Tucano sales and deliveries by invoking its exceptions or waiver provision. No corresponding statutory exceptions or wavier were available to the Executive Branch in *Sanchez-Espinosa.*

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss should be denied.

Respectfully submitted,

*/s/Bruce Fein*
Bruce Fein Esq.
300 New Jersey Avenue, N.W., Suite 900
Washington, D.C. 20001
Phone:  202-465-8728; 703-963-4968
Email: bruce@feinpoints.com
**Counsel for Plaintiff IPOB**

Date: December 1, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2021, I electronically filed the forgoing with the Clerk

of the Court using the CM/ECF system, which will send a notification to counsel of record.

*/s/Bruce Fein*_____

Bruce Fein
300 New Jersey Ave., Suite 900
Washington, D.C. 20001
202-465-8728
bruce@feinpoints.com

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDIGENOUS PEOPLE OF BIAFRA, a
United Kingdom registered Community
Interest Company,'

       *Plaintiff,*                  Civil Action No. 1:21-cv-2068 (ABJ)

     *v.*

ANTHONY BLINKEN, Secretary of State, in
his official capacity, et al.,

       *Defendants.*

---

## AFFIDAVIT OF BRUCE FEIN

I, Bruce Fein, being sworn, hereby say and depose based on personal knowledge:

1.  I am Nnamdi Kanu's international lawyer and spokesperson.

2.  On October 21, 2021, and November 10, 2021, I was illegally denied access to the Federal High Court of Nigeria, Abuja Judicial Division, by Nigeria's Department of Security Services (DSS) to assist in the defense of Nnamdi Kanu against a seven-count, transparently deficient Criminal Charge No: FHC/ABJ/CR/383/2-15.

3.  I have also been illegally denied access to Nnamdi Kanu at the DSS detention facility in Abuja, Nigeria, on multiple occasions in contempt of a court order.

Bruce Fein

KHALIFA ABUBAKAR
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires March 31, 2023

**EXHIBIT 2**

INDIGENOUS PEOPLE OF BIAFRA, a
United Kingdom registered Community
Interest Company,'

    *Plaintiff,*

    v.

Civil Action No. 1:21-cv-2068 (ABJ)

ANTHONY BLINKEN, Secretary of State, in
his official capacity, et al.,

    *Defendants.*

## AFFIDAVIT OF NIGERIAN BARRISTER IFEANYI EJIOFOR

I, Ifeanyi Ejiofor, being sworn, hereby say and depose based on personal knowledge:

1. I am a licensed Nigerian attorney in good standing.

2. I am lead counsel for Defendant Nnamdi Kanu in the case of Federal Republic of Nigeria v. Nnamdi Kanu before the Federal High Court of Nigeria in the Abuja Judicial Division, Charge No. FHC/ABJ/CR/383/2015.

3. Nnamdi Kanu is the leader of Indigenous People of Biafra (IPOB).

4. Among other things, the Federal Government of Nigeria has charged Mr. Kanu with professing membership in IPOB in alleged violation of section 16 of the Terrorism Prevention Act Amendments, 2013.

5. IPOB has been listed as a terrorist organization by the Federal Government of Nigeria without an opportunity to respond.

6. Any Biafran who affirms membership in IPOB risks retribution or criminal prosecution by the Federal Government of Nigeria under section 16 of the Terrorism Prevention Act Amendments, 2013.

MAXWELL OPARA & ASSOCIATES